IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs June 20, 2017

**STATE OF TENNESSEE v. RICKY LEE PALMER**

**Appeal from the Criminal Court for Davidson County
No. 2015-C-2248     Steve R. Dozier, Judge**

_____

**No. M2016-02153-CCA-R3-CD**

_____

Defendant, Ricky Lee Palmer, appeals from his conviction of aggravated assault for which he was sentenced to six years. On appeal, he challenges the sufficiency of the evidence. We determine that the evidence was monumentally sufficient to sustain the conviction for aggravated assault. Therefore, the judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT H. MONTGOMERY, JR., JJ., joined.

Manuel B. Russ (on appeal) and W. Douglass Love (at trial), Nashville, Tennessee, for the appellant, Ricky Lee Palmer.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Senior Counsel; Glenn R. Funk, District Attorney General; and J. Wesley King, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

Defendant, Maria Deleta Flowers, and Scottie Lee Mofield were indicted by the Davidson County Grand Jury for the aggravated assault of a homeless man, Robert Vaughn.[1] At trial, the fifty-year-old victim explained that he was living in a homeless camp with his friend, Dane McPeak, "in the Murfreesboro Road area in between Thompson Lane and . . . Fesslers Lane area . . . around Mill Creek." The camp was

_____

[1] The three defendants were tried jointly, but this appeal involves only the conviction for Defendant Palmer.

located near the Casa Linda Apartments. The victim worked by "selling the homeless paper" called "The Faith Unity."

Pauline Spaulding was the manager of the Casa Linda Apartments. At the time of the incident, "90 percent" of the residents were felons or formerly homeless. The victim and Mr. McPeak used to live at Casa Linda but were evicted for failing to pay their rent. Ms. Spaulding knew the men were living behind the apartments.

On the evening of June 5, 2015, the victim "left the camp [on foot] and . . . was going to the store to get something to drink and a pack of cigarettes." He walked through the woods and down a sidewalk before crossing the street to get to the store. As the victim entered the store, he saw Defendant, Ms. Flowers, and Mr. Mofield outside the store. The victim recognized them "from moving up and down the streets" but did not know their names at that time. The victim went inside the store, purchased his drink and cigarettes, and exited the store at approximately 10:00 p.m. The three defendants were still outside.

The victim sat his drink down on the steps right outside the store and "[o]pened the pack of cigarettes to light a cigarette and that's when everything started to happen from there on." The victim was "approached" by Ms. Flowers who asked if he could "spare a cigarette" or part of his drink. When the victim refused, Ms. Flowers "pushed [his] back, picked up the beverage, [and] broke it on the ground," telling the victim that "nobody's going to drink the beer." Defendant and Mr. Mofield "assaulted [the victim] from the back and side," hitting him "with their fists repeatedly" all over his body. The victim was kicked in the face, chest, back, stomach, and legs. The victim could not fight back, instead "trying to cover up" to protect himself. The victim had a knife in his pocket but was unable to use it during the attack. The beating went on for an undetermined period of time before the men "finally just quit." The victim tried to get himself together to "get back to [his] shelter as quick as [he] could."

The victim managed to walk back to his camp. His face was extremely swollen. One eye was "completely shut," and his "eyelid was hanging down on the lower part of [his] face." He could not see out of his eye and was not sure if he was actually blind from the beating. Mr. McPeak described the victim's injuries as follows: "[h]e had been severely beaten," and the victim was bleeding "profusely" from his nose, mouth, and eyes. Mr. McPeak tried to help the victim bandage the wounds, but they could not get the bleeding to stop. The victim did not call 911 because he was "in shock and in fear for [his] life." He stayed up most of the night and described his pain on a scale of one to ten as "above ten."

The next morning, Mr. McPeak talked to Ms. Spaulding and explained the situation. Initially, she gave him ten dollars "to go get some bandages and stuff" to

attend to the victim's injuries. After she "thought about it and pondered," she called the fire department and the police. Ms. Spaulding assisted the rescue squad in locating the victim. They were able to track his location by following a trail of blood. The victim was in "horrible" condition when they found him. His "jaw was hanging . . . down. He looked like something out of a horror show. His eye was gone" and blood was "going fast" out of his eyeball. The victim refused to go to the hospital despite being asked to get medical treatment. Ms. Spaulding called the victim later that day, urging him to go to the hospital because she was worried about his condition. The victim still could not get the blood to stop "squirting out of [his] eye." He finally went to the emergency room by ambulance.

Once he arrived at Vanderbilt, the victim got "[t]he whole nine yards." They sewed his eyelid back on and he received multiple x-rays. The victim had a broken nose, a shattered eye socket, broken dentures, and his jaw was broken in four places. The optic nerve of his right eye was dislodged, resulting in permanent blindness in that eye. He was discharged from Vanderbilt the next day, partially because he did not have insurance. The victim had follow-up treatment at Meharry Hospital, including surgery on his jaw. The victim explained that the "eye socket and the rest [of the] skull fractures and everything, they pretty much . . . just had to let time heal them on their own."

The victim admitted on cross-examination that he had seizures and blackouts prior to the attack and that he had never received medical treatment for the seizures. The victim also acknowledged a prior drug conviction.

Once the victim was discharged from the hospital, Ms. Spaulding allowed him and Mr. McPeak to stay in a unit at Casa Linda on the ground floor. Mr. McPeak started working for Ms. Spaulding and eventually became a full-time employee.

Lukas Cantrell, a detective with the Metropolitan Nashville Police Department, spoke with the victim several days after the incident. He observed the victim's "major physical injuries" on his face and torso. Detective David Studer tried to make contact with the victim several weeks after the incident. The victim was in the hospital at the time. Detective Studer eventually talked with the victim at Casa Linda and presented the victim with photographic lineups. The victim identified all three defendants from the lineups.

Ms. Flowers testified in her defense at trial that she was living under a bridge on Murfreesboro Pike at the time of the incident. She lived with her boyfriend, Mr. Mofield, and her brother, Defendant. On the night of the incident, the three defendants were sitting outside Saint Mary's Market "finishing a beer" when the victim came out of the store. She knew the victim was homeless and had seen him eating at a church where many homeless people went for a free meal once a week. As he exited the store, the

victim "lit a cigarette" and had a conversation with Defendant. The victim started talking to her, "getting agitated because we were still there because he was waiting on the dope man." The victim told her that the "dope man wasn't going to serve him because we were there." When the defendants refused to leave, Ms. Flowers claimed that the victim "started cussing [her] and calling [her] bitches and whores." The victim approached her with his beer in his hand. She stood up. Ms. Flowers was scared because she knew the victim carried a knife and "thought he was going to hit [her] in the head with the beer, so [she] pushed the beer out of his hand." Ms. Flowers claimed that the victim "got really angry" when the beer busted, grabbing Ms. Flowers by the waist and calling her names. She insisted that the other two defendants got the victim off of her but did not recall seeing the victim injured.

At the conclusion of the proof, the jury found Defendant guilty of aggravated assault. At the sentencing hearing, the trial court sentenced Defendant to six years as a Range I, standard offender. Defendant filed a timely motion for new trial in which he alleged that the evidence was insufficient to support the conviction. The trial court denied the motion. Defendant appealed.

*Analysis*

Defendant claims on appeal that the evidence was not sufficient to support the conviction because the State failed to prove that the victim suffered "serious bodily injury." Additionally, Defendant argues that the victim's testimony was "not plausible" because he had a history of seizures, failed to seek medical treatment immediately after the incident, and did not try to protect himself. The State disagrees.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992) (citing *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003). As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*,

805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

As relevant to this case, an assault is defined as "[i]ntentionally, knowingly or recklessly caus[ing] bodily injury to another." T.C.A. § 39-13-101(a)(1). Aggravated assault is further defined as "[i]ntentionally or knowingly commit[ting] an assault [which] . . . [r]esults in serious bodily injury to another." T.C.A. § 39-13-102(a)(1)(A)(i). Serious bodily injury includes "[e]xtreme physical pain," "[p]rotracted or obvious disfigurement," and "[p]rotracted loss or substantial impairment of a function of a bodily member, organ, or mental faculty." T.C.A. § 39-11-106(34)(C)-(E).

The proof at trial, in a light most favorable to the State, showed that the victim was intentionally assaulted by Defendant when he exited the market and refused to share his beer and/or cigarettes. Two men got him on the ground and proceeded to kick and punch him. This beating resulted in a broken nose, a dislocated jaw, a torn eyelid, a detached optical nerve, and multiple bruises. The victim "looked like something out of a horror show" and blood was described as "squirting" out of the victim's eye nearly a day after the incident. The victim rated his pain as "above ten." The victim required jaw surgery and is now permanently blind in one eye. These injuries surely rise to the level of serious bodily injury—the victim lost the use of one of his eyes. *See* T.C.A. § 39-11-106(34)(E). The evidence is monumentally sufficient to support the conviction. As for Defendant's claim that the victim's story was not plausible, the jury heard the testimony and clearly accredited the victim's testimony, as was their prerogative. *See Pruett*, 788 S.W.2d at 561. Defendant is not entitled to relief on this issue.

*Conclusion*

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
TIMOTHY L. EASTER, JUDGE